# UNITED STATES DISTRICT COURT

for the
Northern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 8:24-MJ-512 (ML) |
| (A) ONE BLACK KYOCERA FLIP PHONE; | ) |
| (B) ONE RED APPLE IPHONE SE; | ) |
| (C) ONE DARK BLUE APPLE IPHONE WITH MAGNETIC MOUNTING PLATE; | ) |
| (D) ONE DARK BLUE APPLE IPHONE; | |
| (E) ONE ROSE GOLD APPLE IPHONE 16; | |
| (F) ONE WHITE APPLE IPHONE X; AND | |
| (G) ONE GOLD INFENNIX HOT-800 CELL PHONE | |
| FURTHER DESCRIBED IN ATTACHMENT A. | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

(A) ONE BLACK KYOCERA FLIP PHONE; (B) ONE RED APPLE IPHONE SE;
(C) ONE DARK BLUE APPLE IPHONE WITH MAGNETIC MOUNTING PLATE;
(D) ONE DARK BLUE APPLE IPHONE;
(E) ONE ROSE GOLD APPLE IPHONE 16;
(F) ONE WHITE APPLE IPHONE X; AND
(G) ONE GOLD INFENNIX HOT-800 CELL PHONE
FURTHER DESCRIBED IN ATTACHMENT A.

located in the Northern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code, Sections 1324 and 1325. | Alien smuggling and conspiracy to commit the same, and improper entry by alien. |

The application is based on these facts:
See Attached Affidavit.

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*D. Matthews*                    11/4/2024 - 1:00 PM

*Applicant's signature*

Dustin M. Matthews, Border Patrol Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date:    11/4/2024

*Judge's signature*

City and state:    Syracuse, NY

Hon. Mitchell J. Katz, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>(A) ONE BLACK KYOCERA FLIP PHONE;<br>(B) ONE RED APPLE IPHONE SE;<br>(C) ONE DARK BLUE APPLE IPHONE<br>WITH MAGNETIC MOUNTING PLATE;<br>(D) ONE DARK BLUE APPLE IPHONE;<br>(E) ONE ROSE GOLD APPLE IPHONE 16;<br>(F) ONE WHITE APPLE IPHONE X; AND<br>(G) ONE GOLD INFENNIX HOT-800 CELL<br>PHONE | Case No.  8:24-MJ-512 (ML) |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Dustin M. Matthews, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of seven electronic devices and the extraction of electronically stored information from those devices. The devices in question are as follows:

   a.   One Black Kyocera Flip Phone;

   b.   One Red Apple iPhone SE;

   c.   One Dark Blue Apple iPhone with magnetic mounting plate;

   d.   One Dark Blue Apple iPhone;

   e.   One Rose Gold Apple iPhone 16;

   f.   One White Apple iPhone X; and

   g.   One Gold Infennix Hot-800

(collectively, the "Subject Devices"). The Subject Devices are currently in the custody of the United States Border Patrol at 4525 US Highway 11, Malone, New York 12953. The description of the property to be searched is described in the following paragraphs and in Attachment A. The evidence sought is described in Attachment B.

2.      I am a Border Patrol Agent ("BPA") with the United States Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection ("CBP"), United States Border Patrol, and am assigned to the Burke Border Patrol Station. I have been a BPA since December 7, 2009. My primary duty is to assist in the prevention of illicit trafficking of people and contraband between the official ports of entry. My authority to perform this mission is articulated in the Immigration and Nationality Act, sections 235 and 287, and Title 8, United States Code, Section 1357. These bodies of law relate to, among other things, a Border Patrol Agent's authority to interrogate any alien or person believed to be an alien, and to make an arrest of any alien who is entering or attempting to enter the United States in violation of the immigration laws. To enforce these laws, I have received training at the Federal Law Enforcement Training Center in Artesia, New Mexico in law, operations, firearms, driving techniques, and physical techniques.

3.      I have investigated violations of the Immigration Nationality Act ("INA") including illegal entry of aliens in violation of Title 8, United States Code, Section 1325; the smuggling of aliens in violation of Title 8, United States Code, Section 1324; and the illegal reentry of aliens in violation of Title 8, United States Code, Section 1326.  I am a "Federal law enforcement officer," with the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have written and executed search warrants for electronic devices and have

reviewed the evidence contained within.  I have analyzed data and information from electronic devices and presented that data as evidence during criminal investigations.

4.     The statements and facts set forth in this affidavit are based in significant part on the following: a review of Border Patrol reports; my discussion with other investigators and BPAs involved in this investigation; my own involvement in the investigation; and my training and experience as a BPA. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Javokhir ISMOILOV ("ISMOILOV") has committed a violation of Title 8, United States Code, Section 1324 (alien smuggling and conspiracy to commit the same); and that Nur RASULEV ("RASULEV") and Azamjon MAHKAMOV ("MAHKAMOV") have committed violations of Title 8, United States Code, Section 1325 (improper entry by alien), and that evidence of those violations is located inside the Subject Devices. There is also probable cause to search the Subject Devices, as described in Attachment A, for evidence instrumentalities, contraband, and/or fruits of these crimes, as described in Attachment B.

## **PROBABLE CAUSE**

6.     On October 24, 2024, at approximately 1:15 AM, Swanton Sector Border Patrol Radio Dispatch notified BPAs assigned to the Burke Border Patrol Station that two individuals were detected in an area known as "Wilson Farm Trail" near Churubusco, New York. A stationary camera had captured an image of the individuals walking south, away from the United States/Canada international border, towards Frontier Road using Wilson Farm Trail. Frontier Road parallels the United States/Canada international border, coming as close as twenty yards to the

border in some locations. This area is frequently used for smuggling activity due to its remoteness, proximity to the United States/Canada border and its multiple points of egress.

7.     Agents responded to the area in anticipation of a smuggling vehicle picking up the two individuals. At 1:22 AM, electronic surveillance equipment detected a sedan driving westbound on Frontier Road from the direction of New York State Route 189. The vehicle continued west along Frontier Road in the direction of the Wilson Farm Trail area.

8.     At approximately 1:31 AM, the same sedan was detected travelling eastbound on Frontier Road, now driving in the opposite direction towards Route 189. Based on agents' training and experience, a quick turnaround time such as this was consistent with the vehicle being involved with the border crossing activity in the Wilson Farm Trail area. Agents moved toward Route 189 in an effort to locate the sedan. One agent observed the sedan traveling southbound at a high rate of speed on Route 189 at the intersection of Route 189 and Looby Road. The agent began following the sedan, and noted that the vehicle was travelling more than 80 MPH. As the agent got closer to the vehicle, the vehicle abruptly slowed to the posted speed limit of 55 MPH and thereafter constantly braked, repeatedly slowing down and then speeding back up. The vehicle, now identified as a blue Kia Optima, had an illegal license plate cover that obscured the state and number listed on what appeared to be a paper temporary tag. As the Optima approached the intersection of Route 189 and New York State Route 11, the agent following the Optima activated his emergency lights and sirens to execute a vehicle stop. The Optima yielded just short of the intersection.

9.     Agents approached the Optima and identified themselves as BPAs. There were three occupants in the vehicle: the driver, a front passenger, and a back seat passenger. All the vehicle's windows were down and agents could clearly see that the front and back seat passengers

4

were soaking wet, while the driver was completely dry. It had rained in the Churubusco, New York, area earlier that night, and the passengers' wet condition was consistent with having walked through the wet, wooded area near Wilson Farm Trail. Agents asked the driver, later identified as ISMOILOV, where he was coming from and he responded, "New York." Agents asked ISMOILOV to step out of the vehicle because ISMOILOV was not following agents' directives to keep his hands where they could be seen and instead continually reached into the driver door pocket and center console.

10.    ISMOILOV was detained in the back of a marked Border Patrol service vehicle while agents interviewed the Optima's passengers. Both passengers, later identified as MAHKAMOV and RASULEV, claimed to be from Uzbekistan and both admitted to illegally crossing the United States/Canada border earlier that night. All three subjects were detained and transported to the Burke Border Patrol Station for further record checks and processing.

11.    At the Burke Border Patrol Station, the subjects and their personal belongings were searched incident to arrest for weapons or contraband. During these searches, BPAs seized several electronic devices from each individual. The devices were each discovered on the person of the subjects as follows:

  a.  ISMOILOV: One black Kyocera Flip phone; one red Apple iPhone SE; and one dark blue Apple iPhone with a magnetic mounting plate.

  b.  MAHKAMOV: One dark blue Apple iPhone; and one rose gold Apple iPhone 16.

  c.  RASULEV: One white Apple iPhone X; and one gold Infennix Hot-800 cell phone.

12.    At the station, biographical information and fingerprints were entered into DHS databases for all three subjects. Record checks revealed that ISMOILOV is a citizen of Uzbekistan and had been previously apprehended by Campo, California, Border Patrol Agents when he

illegally entered the United States from Mexico on June 29, 2023.  Record checks revealed that MAHKAMOV and RASULEV are citizens of Uzbekistan with no legal status in the United States or documentation that allowed them to be in, pass through, or remain in the United States legally.

13.     Based on my training and experience in this and other criminal investigations I have been involved with, including other investigations involving individuals entering the United States illegally, individuals who illegally cross the border will often communicate and coordinate with individuals in the United States to arrange for someone to pick them up once they have successfully crossed, or to inform individuals in the United States or in their country of origin that they successfully crossed. Alien smugglers often communicate with each other and with the individuals they smuggle using cellular phones and downloaded applications to coordinate smuggling events. Smartphones, such as the Subject Devices, can also be used to access social media. Based on my training, knowledge, and experience with alien smuggling, I know that social media platforms such as Facebook, as well as telecommunications platforms such as WhatsApp, are often used by smugglers to find customers and for communication between smugglers and aliens illegally entering the United States. Additionally, individuals involved in crossing the border illegally often use a cellular telephone's GPS function to search for and map out potential crossing and pickup locations and to navigate to such places.

14.     In this case, the timing of when MAHKAMOV and RASULEV were picked up by ISMOILOV speaks to the coordination involved in the smuggling event. ISMOILOV's vehicle was detected in the area less than ten minutes after the aliens were first spotted on Wilson Farm Trail, and the vehicle's quick turnaround time is indicative of ISMOILOV knowing exactly where to pick the aliens up after he arrived on Frontier Road. The time of night, between 1:00 and 1:30 AM, is also common for smuggling events and also indicates the aliens and ISMOILOV were

coordinating the event. Additionally, the Wilson Farm Trail area of Frontier Road is an extremely remote location, as few residences and no businesses are located in the area. The remote pickup location also speaks to coordination between the parties. Given that each subject had at least two (and in ISMOILOV's case, three) cell phones in his possession after crossing the border, probable cause exists that evidence related to communication or coordination of the smuggling event exists on the Subject Devices.

15.     The Subject Devices are currently in storage at the Burke Border Patrol Station.  In my training and experience, I know that the Subject Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the Border Patrol.

## TECHNICAL TERMS

16.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. They may also have removable storage media connected to them or stored with them, including micro-SD cards or other types of memory cards.

b.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer that accesses the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term— IP addresses, while other computers have dynamic—that is, frequently changed— IP addresses.

c.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the

removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

e.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

f.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna

9

receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

g.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

17.    Based on my training, experience, and research, I know that the Subject Devices are they type of electronic devices that have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Also, due to the nature and circumstances of the offenses in this case, it is reasonable to expect that records relating to communications MAHKAMOV and RASULEV engaged in with individuals in Canada or the United States to facilitate their border crossing or pickup once in the United States may be found

10

in the devices attributable to those subjects. It is also reasonable to expect that records relating to communications ISMOILOV engaged in with individuals in Canada or the United States to coordinate the other subjects' pickup may be found on the Subject Devices attributable to ISMOILOV, including communications with MAHKAMOV and RASULEV themselves or other parties that directed or assisted ISMOILOV's activities.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

18.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, certain information from webpages and media that has been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

19.     There is probable cause to believe that things that were once stored on the Subject Devices may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition,

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

20.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the above-listed offenses, but also forensic evidence that establishes how the Subject Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Subject Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage

12

medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection, in order to determine whether it is evidence described by the warrant.  The examination will be performed by representatives from the Department of Homeland Security and their designees.

22.    *Manner of execution.*    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Additionally, it is unclear at this time what hours the government employee(s) who will be doing the examinations of these Subject Devices will be working at the time they perform them.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

23.    Based on the foregoing information, I submit that there is probable cause to believe that ISMOILOV has violated Title 8, United States Code, Section 1324 (alien smuggling and conspiracy to commit the same); and that RASULEV and MAHKAMOV have violated Title 8, United States Code, Section 1325 (improper entry by alien). I respectfully request that a warrant be issued authorizing the search of the Subject Devices for evidence, instrumentalities, contraband, and/or fruits of those offenses.

ATTESTED TO BY THE APPLICANT IN ACCORDANCE WITH THE REQUIREMENTS OF
RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

*D. Matthews*    11/4/2024 - 1:00 PM

Dustin M. Matthews
Border Patrol Agent
United States Border Patrol


I, the Honorable Mitchell J. Katz, United States Magistrate Judge, hereby acknowledge that this
affidavit was attested to by the affiant by telephone on November ___4___, 2024 in accordance with
Rule 41 of the Federal Rules of Criminal Procedure.

Hon. Mitchell J. Katz
United States Magistrate Judge

## ATTACHMENT A

### Property to be Searched

This warrant applies to the following electronic devices (collectively, the "Subject Devices"), to include any attached computer or electronic storage media including SD cards, all of which are currently in the custody of the United States Border Patrol at 4525 US Highway 11, Malone, New York 12953. This warrant authorizes the forensic examination of the Subject Devices for the purpose of identifying the electronically stored information described in Attachment B.

a.    One black Kyocera Flip Phone, seized from Javokhir ISMOILOV;



b.      One red Apple iPhone SE, seized from Javokhir ISMOILOV;



c.      One dark blue Apple iPhone with a magnetic mounting plate, seized from Javokhir

ISMOILOV;



d.  One dark blue Apple iPhone, seized from Azamjon MAHKAMOV;



e.  One rose gold Apple iPhone 16, seized from Azamjon MAHKAMOV;



f.      One white Apple iPhone X, seized from Nur RASULEV;

 

g.      One gold Infennix Hot-800 cell phone, seized from Nur RASULEV.

 

## ATTACHMENT B

## Items to be Seized and Searched

1.      All evidence, fruits, contraband, and/or instrumentalities of violations of Title 8, United States Code, Section 1324 and 1325 (alien smuggling and conspiracy to commit the same, and improper entry by alien), those violations involving Javokhir ISMOILOV, Azamjon MAHKAMOV, and Nur RASULEV, and other as-yet unidentified co-conspirators, specifically the following from the Subject Devices, described with specificity in Attachment A, including deleted data, remnant data, or data contained within slack space:

    a.      Text messages, instant messages, chat room messages, emails, voice mail messages, and/or other communications relating to illegal international border crossings;

    b.      Records regarding any calls made or received;

    c.      Any photographs or audio recordings that relate to illegal international border crossings

    d.      Geolocation, mapping, and GPS records including information recording schedules or travel;

    e.      Records of, or information about, any Internet activity including records of Internet Protocol addresses used, firewall logs, caches, browser history, cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

    f.      Evidence indicating the device user's state of mind as it relates to the crimes under investigation;

g.    Evidence of the attachment to the device or of the device to other storage devices or similar containers for electronic evidence;

h.    Evidence of counter-forensic programs (and associated data) that are designed to restrict access to, facilitate concealment of, or eliminate data from the device.

2.    Evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, including:

a.    Logs, phonebooks, saved usernames and passwords, documents and browsing history to include Internet Protocol addresses used, internet activity, firewall logs, cashes, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-type web addresses.

b.    Evidence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as the evidence of the presence or absence of security software designed to detect malicious software;

c.    Evidence of the lack of such malicious software;

d.    Evidence indicating how and when the device was accessed or used to determine the chronological context of device access, use, and events relating to the crimes under investigation and to the device user.

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.     During the search of the Subject Devices as described above, photographs may be taken to record the condition thereof.